**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Loani Ramos Sanchez**

v. Case No. 1:25-cv-422-PB-AJ
Opinion No. 2026 DNH 148

**Markwayne Mullin, Secretary,**
**United States Department of**
**Homeland Security, et al.**

## MEMORANDUM AND ORDER

Loani Ramos Sanchez challenges a decision by U.S. Citizenship and Immigration Services ("USCIS") to deny her deferred action after approving her petition for Special Immigrant Juvenile Status ("SIJS"). According to Ramos Sanchez, USCIS's failure to apply certain presumptions in favor of granting deferred action to those approved for SIJS constitutes a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. The government contends that the Court is barred from exercising jurisdiction over Ramos Sanchez's claim by 8 U.S.C. § 1252(g) and 5 U.S.C. § 701(a)(2). It has accordingly moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). Because I am unpersuaded that either provision divests this Court of jurisdiction, I deny the government's motion.

# I. BACKGROUND

## A. Regulatory Framework

SIJS is available to certain qualifying noncitizens who entered the United States as juveniles. To be eligible for SIJS, a petitioning individual must, at the time of filing, be (i) under 21 years of age; (ii) unmarried; (iii) physically present in the United States; and (iv) subject to a juvenile court order meeting relevant criteria. 8 C.F.R. § 204.11(b)-(c); see also 8 U.S.C. § 1101(a)(27)(J). Those criteria require that the juvenile court (i) declare the petitioner "dependent upon the juvenile court" or commit to or place the petitioner under the custody of a state agency or state-appointed entity; (ii) determine that "parental reunification with one or both parents is not viable due to abuse, abandonment, neglect, or a similar basis under State law"; (iii) determine that "it would not be in the petitioner's best interest to be returned to the petitioner's or their parent's country of nationality or last habitual residence"; and (iv) issue the order pursuant to the juvenile court's "authority over the petitioner as a juvenile" and in accordance with "applicable State law." 8 C.F.R. § 204.11(c); see also 8 U.S.C. § 1101(a)(27)(J). Once a petitioner presents evidence satisfying the above requirements and USCIS approves the petition, the petitioner is granted SIJS. See 8 C.F.R. § 204.11(b)-(d).

SIJS can substantially ease a noncitizen's attainment of lawful permanent residence.[1] While noncitizens must normally have been "inspected and admitted or paroled into the United States" in order to apply for adjustment to permanent resident status, 8 U.S.C. § 1255(a), those granted SIJS are excepted from this general rule and automatically "deemed . . . to have been paroled into the United States, regardless of the actual method of entry into the United States," 8 C.F.R. § 245.1(a); see also 8 U.S.C. § 1255(h). Thus, individuals granted SIJS can apply for lawful permanent residence even where their manner of entry into the United States would not normally entitle them to do so.

But SIJS does not entirely clear the way to lawful permanent residence. Another requirement for adjustment to lawful permanent resident status is that "an immigrant visa [be] immediately available to [the applicant] at the time his application is filed." 8 U.S.C. § 1255(a). Noncitizens

[1] Noncitizens are "lawfully admitted for permanent residence" if they have "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws." 8 U.S.C. § 1101(a)(20). Such a designation allows a noncitizen to obtain a Form I-551 Permanent Resident Card (commonly known as a "Green Card"), see 7 USCIS Policy Manual, pt. A, ch. 1, § B (2026), and authorizes employment in the United States without restriction, see 8 C.F.R. § 274a.12(a)(1).

with SIJS are eligible for EB-4 visas.[2] However, because the number of EB-4 visas available each year is subject to statutorily mandated caps, noncitizens with SIJS must frequently wait years after attaining SIJS to obtain the visa they need to apply for lawful permanent resident status.

In a Policy Alert issued in March 2022 (the "2022 Policy"[3]), USCIS acknowledged that the ongoing unavailability of EB-4 visas had been preventing many individuals with SIJS from applying for adjustment to lawful permanent resident status. 2022 Policy at 1. Reasoning that the effect of the EB-4 visa backlog was inconsistent with congressional intent to protect an "especially vulnerable population," USCIS declared that it "will consider granting deferred action on a case-by-case basis to noncitizens classified as SIJs who are ineligible to apply for adjustment of status solely due to unavailable immigrant visa numbers." Id.

Under the 2022 Policy, deferred action decisions must be made "on a case-by-case basis, based on the totality of the evidence, whether the person

---

[2] The term "EB-4" refers to the subcategory of visas available to "special immigrants" (of which individuals with SIJS are one subgroup among others) within the broader category of "employment-based" visas. See 8 U.S.C. § 1153(b)(4); 8 U.S.C. § 1101(a)(27). The "worldwide number" of employment-based visas is determined annually according to the formula provided in 8 U.S.C. § 1151(d), and the number of EB-4 visas is set at 7.1 percent of that worldwide number by 8 U.S.C. § 1153(b)(4).

[3] U.S. Citizenship & Immigr. Servs., Policy Alert PA-2022-10, Special Immigrant Juvenile Classification and Deferred Action (Mar. 7, 2022).

warrants a favorable exercise of discretion." Id. at 3 n.6. Individuals granted deferred action—who would otherwise be removable and unable to attain lawful employment authorization—are temporarily immune from removal and eligible to apply for employment authorization. Id. at 2-3; see also 8 C.F.R § 274a.12(c)(14). When USCIS issued the 2022 Policy, it argued that the deferred action program would advance Congress's purposes in establishing the SIJS designation and avoid leaving individuals with SIJS "in limbo" for years. 2022 Policy at 1.

Although the 2022 Policy requires only case-by-case consideration of deferred action, contemporaneous statements made in USCIS's Policy Manual strongly suggest that deferred action should be granted to those with approved SIJS petitions. These statements provide that "[o]ne particularly strong positive factor that weighs heavily in favor of granting deferred action is that the person has an approved [SIJS petition]" and that "the eligibility criteria for SIJ classification are generally strong positive factors in such a determination." 6 USCIS Policy Manual, pt. J, ch. 4, § G(2) (2024) (reproduced in Doc. 10-2). Further evidence of the then-presumptive effect of an SIJS designation is the fact that, during the first two years of the program, "the vast majority of SIJS approvals came with a grant of deferred action." A.C.R. v. Noem, 809 F.Supp.3d 103, 112 (E.D.N.Y. 2025) (citing

affidavit from immigration attorney in case involving claims similar to those presented here).

Starting in April 2025, however, USCIS ceased to apply any presumption in favor of deferred action. At first, USCIS simply stopped granting deferred action concurrent with SIJS approval, even though it had not officially changed its policy guidelines. See id. (again citing affidavits from immigration attorneys). Then, in June 2025, USCIS issued another Policy Alert (the "2025 Policy"[4]) that effectively rescinded the 2022 Policy. The 2025 Policy declared that "USCIS will no longer consider granting deferred action on a case-by-case basis to aliens classified as SIJs who are ineligible to apply for adjustment of status solely due to unavailable immigrant visas." 2025 Policy at 2. USCIS also updated the relevant provisions of its Policy Manual accordingly. See 6 USCIS Policy Manual, pt. J, ch. 4, § G (2026).

Within months, USCIS was enjoined from rescinding the 2022 Policy. In A.C.R. v. Noem, 809 F.Supp.3d 103, the Eastern District of New York decided that USCIS's failure to adequately consider reliance interests and reasonable alternatives when issuing the 2025 Policy rendered its rescission likely "arbitrary and capricious" and thereby in violation of the APA, 5 U.S.C.

---

4 U.S. Citizenship & Immigr. Servs., Policy Alert PA-2025-07, Special Immigrant Juvenile Classification and Deferred Action (June 6, 2025).

§ 706(2)(A). The court issued a preliminary injunction on November 19, 2025, staying the rescission of the deferred action program and requiring USCIS to "conduct deferred-action and employment-authorization adjudications pursuant to the 2022 Policy Alert, pending promulgation of a valid rescission policy or further order from this Court."[5] A.C.R., 809 F.Supp.3d at 128. While USCIS subsequently issued a new Policy Memorandum in April 2026, U.S. Citizenship & Immigr. Servs., Policy Memorandum PM-602-0198, Special Immigrant Juvenile Classification and Deferred Action (April 10, 2026) (the "2026 Policy"), again rescinding the 2022 Policy, the memorandum is expressly prospective in nature, only taking effect thirty days after issuance. See 2026 Policy at 1, 9. The 2026 Policy provides that "[a] petition that is or has been submitted or approved before this policy is effective will be subject to the policy that this memorandum terminates." Id. at 9. Therefore, the A.C.R. injunction had the effect of requiring USCIS to automatically consider granting deferred action in conjunction with the approval of any petition for SIJS submitted before May 10, 2026.

5 The A.C.R. court expressly noted that its order staying the 2025 Policy was not constrained by the Supreme Court's limitations on universal relief set forth in Trump v. CASA, Inc., 606 U.S. 831 (2025), as CASA "left open the possibility that plaintiffs could obtain universal injunctive relief by seeking vacatur under the APA." 809 F.Supp.3d at 129 n.25 (citing 606 U.S. at 847 n.10).

## B. Plaintiff's Status

Ramos Sanchez was born in Honduras in 2003 and entered the United States as a seventeen-year-old in February 2021. See Doc. 1 at 6. Upon entry, she was held by the Office of Refugee Resettlement and then released to her brother, who lived in New Hampshire. Id. at 1. On September 10, 2021, the day before Ramos Sanchez turned eighteen years old, a different brother filed a Petition for Abuse and Neglect with the Manchester Family Division of the New Hampshire Ninth Circuit Court (the "Family Court"). Id. In the petition, Ramos Sanchez's counsel expressly consented to the Family Court retaining jurisdiction over her case even after her eighteenth birthday, as permitted under New Hampshire law. See Doc. 1-1 (citing N.H. Rev. Stat. Ann. § 169-C:4, II).

On June 3, 2024, the presiding judge of the Family Court issued a Judgment and Special Finding of Facts and Ruling of Law determining that (i) the Family Court had jurisdiction pursuant to New Hampshire law to make determinations about Ramos Sanchez's dependency; (ii) Ramos Sanchez was dependent upon the Family Court; (iii) Ramos Sanchez had been neglected and/or abandoned by both of her parents; (iv) reunification with either of her parents was not viable; (v) it was in Ramos Sanchez's best interest to remain in New Hampshire in the care of her brother; and (vi) it was not in her best interest to be returned to Honduras. See Doc. 1-2. In the

order, the presiding judge expressly entered the findings "nunc pro tunc, relating back to the date of the original petition's filing on September 10, 2021." Id. at 2.

Citing the determinations of the Family Court, Ramos Sanchez then filed a petition for SIJS with USCIS. Doc. 1 at 2. However, on October 22, 2024, USCIS issued a Notice of Intent to Deny with respect to Ramos Sanchez's petition on the ground that the Family Court's nunc pro tunc order—issued after Ramos Sanchez had turned eighteen—did not establish that the Family Court exercised jurisdiction over Ramos Sanchez as a juvenile under New Hampshire law because the order did not correct a prior signed court order issued while Ramos Sanchez was still a minor. See Doc. 1-4 at 3. Ramos Sanchez responded with a legal memorandum arguing that a nunc pro tunc order does not need to correct a prior signed court order to have retroactive effect under New Hampshire or federal law. See Doc. 1-5 at 4-8. Notwithstanding Ramos Sanchez's legal arguments, USCIS denied her petition on December 3, 2024, asserting that "[y]ou have not met your burden of proof showing this court exercised jurisdiction over you as a juvenile under State law pursuant to [8 U.S.C. § 1101(a)(27)(J)]." Doc. 1-6 at 3.

Once Ramos Sanchez's petition had been denied, she filed motions to reopen and reconsider her petition pursuant to 8 C.F.R. § 103.5(a). Doc. 1 at 2-3. That provision allows petitioners to request reopening and

reconsideration if they state "new facts to be provided" and "state the reasons for reconsideration . . . supported by any pertinent precedent decisions to establish that the decision was based on an incorrect application of law or [USCIS] policy." 8 C.F.R. § 103.5(a). Ramos Sanchez attached to her motions an amended order from the Family Court, issued January 2, 2025, in which the presiding judge reiterated her determinations from the initial order and clarified that New Hampshire law does not require a prior court order to be amended for a subsequent nunc pro tunc order to take retroactive effect. See Doc. 1 at 2-3; Doc 1-7. Nevertheless, USCIS again rejected Ramos Sanchez's arguments, issuing a decision denying reconsideration on February 13, 2025. See Doc. 1-8. USCIS provided no new reasoning and offered no acknowledgment that it had even received the amended order from the Family Court submitted with Ramos Sanchez's motion. See id.

## C. Procedural Posture

Ramos Sanchez then initiated legal proceedings before this Court, filing a complaint on October 28, 2025. Doc. 1. She claimed that USCIS, in entirely failing to address the Family Court's interpretation of New Hampshire law and instead imposing its own view of state law, had "arbitrarily and capriciously" denied her petition for SIJS in violation of the APA. See id. at 11-13. But Ramos Sanchez did not need to wait for this Court to rule before obtaining relief on the specific issue of the denial of her petition. On March 4,

2026, USCIS reopened and approved Ramos Sanchez's petition for SIJS—but with the express qualification that deferred action did not accompany approval. USCIS offered no reasoning to justify its denial of deferred action. See Doc. 8-1.

Soon after approving Ramos Sanchez's petition, the government moved to dismiss her initial complaint under Rule 12(b)(1). Doc. 8. The government argued that because Ramos Sanchez had "already received all of the relief she seeks in her Complaint, this case no longer presents a live case or controversy for this Court to adjudicate" and should therefore be dismissed for mootness. Id. at 4.

Although Ramos Sanchez had been granted the relief she specifically sought in her initial complaint (namely, SIJS), that relief by itself did not resolve Ramos Sanchez's dispute with USCIS regarding her legal status. Due to the continuing shortage of EB-4 visas, Ramos Sanchez still could not apply for adjustment to lawful permanent resident status. See Doc. 16 at 2-3. Thus, without an attendant grant of deferred action, SIJS left Ramos Sanchez without protection against removal or the ability to apply for employment authorization.

Ramos Sanchez filed an amended complaint on April 6, 2026, in which she argues that USCIS, in granting her SIJS without deferred action, failed to adhere to its "operative policy requir[ing] that a grant of SIJS itself be a

strong positive factor in granting deferred action." Doc. 10 at 10. Because USCIS failed to offer a reasoned explanation for its decision, Ramos Sanchez claims that USCIS acted "arbitrarily and capriciously," thereby violating the APA. Id. at 9-10. She requests that USCIS's denial of deferred action be set aside. Id. (citing 5 U.S.C. § 706(2)(A)).

In response to the amended complaint, the government again moved to dismiss under Rule 12(b)(1). Doc. 14. The government now argues that I am precluded by statute from exercising jurisdiction over Ramos Sanchez's claim challenging her denial of deferred action. See id. at 7-11.

## II. STANDARD OF REVIEW

A defendant may attack the court's subject matter jurisdiction through a motion to dismiss pursuant to Rule 12(b)(1) either by challenging the facial sufficiency of the plaintiff's jurisdictional claim or by questioning its factual basis. Torres-Negrón v. J & N Records, LLC, 504 F.3d 151, 162 (1st Cir. 2007) (citing Fed. R. Civ. P. 12(b)(1)). Facial challenges, like the one presented in this case, are evaluated using the familiar plausibility standard that applies to motions to dismiss for failure to state a claim. Gordo-González v. United States, 873 F.3d 32, 35 (1st Cir. 2017). Under that standard, dismissal "is appropriate only when the facts adumbrated in the plaintiff's complaint, taken at face value, fail" to demonstrate the court's jurisdiction. Id.

## III. ANALYSIS

Under the APA, a "person suffering legal wrong because of agency action" is generally "entitled to judicial review thereof." 5 U.S.C. § 702. The government argues, however, that jurisdiction over Ramos Sanchez's challenge is barred for two reasons. See Doc. 14 at 7-11. First, it contends that the jurisdiction-stripping provision of 8 U.S.C. § 1252(g) applies in the context of USCIS's denial of deferred action. Id. at 7-8. And second, it claims that the decision whether to grant deferred action in an individual case is an action "committed to agency discretion by law" and thus unreviewable under 8 U.S.C. § 701(a)(2). Id. at 8-11. I address the parties' arguments with respect to both provisions.

### A. 8 U.S.C. § 1252(g)

In relevant part, § 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g). The Supreme Court adopted a "narrow reading" of this language in Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999), emphasizing that the jurisdictional bar applies only to review of "three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders,'" id. at

482 (quoting 8 U.S.C. § 1252(g)) (emphasis in original). A corollary of this interpretation is that "many other decisions or actions that may be part of the deportation process" remain outside the scope of § 1252(g). Id.

In Department of Homeland Security v. Regents of the University of California, 591 U.S. 1 (2020), the Supreme Court held that § 1252(g)'s jurisdictional prohibitions did not prevent it from reviewing agency decisions denying deferred action, see id. at 19. That case involved an APA challenge to the rescission of Deferred Action for Childhood Arrivals ("DACA"). See id. at 9-13. Like the 2022 Policy did for those with SIJS, DACA temporarily protected certain qualifying noncitizens from removal and permitted them to apply for employment authorization. See id. The Court, citing Reno, reasoned that "[t]he rescission [of DACA], which revokes a deferred action program with associated benefits, is not a decision to 'commence proceedings,' much less to 'adjudicate' a case or 'execute' a removal order." Id. at 19 (citing 525 U.S. at 482).

According to the government, § 1252(g) precludes jurisdiction over this case because Ramos Sanchez's claim "necessarily seeks to challenge the Executive's decision to continue—i.e., not defer—the prosecution of her removal proceedings" and therefore "plainly constitutes a challenge to the government's decision to 'adjudicate' her removal proceedings." Doc. 14 at 8. Moreover, the government argues, the Court's statement in Reno that

"[s]ection 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations" militates against assuming jurisdiction. See id. (quoting 525 U.S. at 485).

The government's contentions fail to persuade for two principal reasons. First, its reading of "adjudication" is inconsistent with Regents. The government's declaration that Ramos Sanchez's claim "plainly constitutes" a challenge to the adjudication of her removal proceedings falls flat in light of the Regents Court's unambiguous position that agency decisions denying deferred action do not amount to decisions to "adjudicate" a case (or to decisions "commencing proceedings" or "executing" removal orders, for that matter). See 591 U.S. at 19.

Second, the facts of Reno are sufficiently distinguishable to render its discussion of Congress's intent inapposite here. In Reno, the Court decided that § 1252(g) barred review of the respondents' claims that the Immigration and Naturalization Service (the precursor to USCIS) unconstitutionally targeted them for deportation due to their political affiliations. See 525 U.S. at 472-76. Crucially, the respondents in Reno argued that the discretionary institution of removal proceedings was itself unlawful, see id., placing their claims much more squarely within § 1252(g)'s prohibition on review of claims arising out of decisions to "commence proceedings." Here, the government does not base its argument on the existence of any ongoing removal

proceedings against Ramos Sanchez.[6] Without removal proceedings underway, the controlling force of Reno becomes tenuous.[7]

---

[6] Ramos Sanchez acknowledges that she had been subject to removal proceedings in the past, but she asserts that the proceedings were terminated in July 2024. See Doc. 16 at 4-5. The government nowhere claims that any removal proceedings against Ramos Sanchez are currently ongoing. See Doc. 14. To the extent that the government's position relies at all on the past removal proceedings, it is unclear why the fact of terminated removal proceedings would influence the § 1252(g) inquiry regarding a challenge to a denial of protection against future removal proceedings, and the government offers no reasoned analysis supporting that proposition.

[7] It is worth noting that even in circumstances where removal proceedings have been instituted or removal has already been executed against individuals previously granted SIJS and deferred action, several courts have found § 1252(g) not to prohibit challenges to the (explicit or implicit) rescission of deferred action. For example, in Ramos-Lopez v. Bondi, 838 F.Supp.3d 457 (D. Md. 2026), the District of Maryland considered a claim brought by a noncitizen who had been removed to Guatemala despite having been granted SIJS and deferred action. In ordering the government to facilitate the individual's return to the United States, the court found that § 1252(g) did not apply because the plaintiff did "not challenge the execution of the in absentia removal order, but rather its effect: that his removal from the United States without process amounts to an illegal rescission of his SIJS and deferred action." Id. at 467; see also Hernandez Garcia v. Mullin, 2026 WL 1266246, at *8 (E.D. Tenn. May 8, 2026) (holding that § 1252(g) did not bar a habeas petition challenging a noncitizen's termination of deferred action and subsequent detention, as the petition concerned "review of conduct outside of § 1252(g)'s orbit: conduct relating to the manner of the termination of a discretionary form of affirmative relief from removal"); Primero v. Mattivelo, 2025 WL 1899115, at *3 (D. Mass. July 9, 2025) (similarly finding that § 1252(g) did not preclude review of a habeas petition challenging the detention of a noncitizen granted SIJS and deferred action but subject to a removal order). Considering that these courts have held § 1252(g) to be inapplicable even where review of a deferred action decision is significantly intertwined with ongoing or completed removal proceedings, it stands to reason that § 1252(g) would not bar jurisdiction where the deferred action

Furthermore, the "no deferred action" decisions contemplated in Reno, see 525 U.S. at 485, differ substantially from the denial of deferred action here. The respondents in Reno did not claim that they qualified for deferred action under a program set forth in an agency policy document that would have protected them from future removal proceedings. See id. at 472-76. Rather, they claimed that the government had selectively exercised its discretion to institute removal proceedings in a way that violated their constitutional rights. Id. For this reason, the "deferred action" determinations referenced in Reno are more closely analogous to entirely discretionary decisions to refrain from instituting removal proceedings than to policy programs systematically granting deferred action to qualifying individuals. Had Ramos Sanchez been ineligible for any kind of deferred action program created by a federal agency and simply been subject to removal proceedings pursuant to executive discretion to enforce immigration statutes, her claim might well be on different legal footing. But that is not the case at bar.

**B. 5 U.S.C. § 701(a)(2)**

Section 701(a)(2)'s bar on judicial review of actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), is an exception to the APA's "basic presumption of judicial review for one suffering legal wrong because of

---

decision at issue would only protect against hypothetical future removal proceedings.

agency action," Regents, 591 U.S. at 16-17 (internal quotations omitted) (cleaned up). "[T]o honor the presumption of review," the Supreme Court has "read the exception in § 701(a)(2) quite narrowly," Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018), finding its application appropriate only where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," Heckler v. Chaney, 470 U.S. 821, 830 (1985).

Agency decisions to refrain from instituting enforcement proceedings comprise one such category of cases immune from judicial review under § 701(a)(2), see id. at 837-38, and the government attempts to place Ramos Sanchez's claim within this category, see Doc. 14 at 9-10. The government primarily relies on Heckler v. Chaney to support its position. See id. (citing 470 U.S. 821). In Chaney, the Supreme Court considered claims brought by death-row inmates challenging the Food and Drug Administration's refusal to institute enforcement actions against states utilizing purportedly illegal substances for lethal injections. See 470 U.S. at 823-27. Reasoning that "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion," the Court held that the refusal to prosecute was precluded from judicial review by § 701(a)(2). Id. at 831-38.

But despite the government's repeated citations to Chaney, the putative connection between Chaney's holding and the unreviewability of the

kind of deferred action decision at issue here has already been severed by the Supreme Court. In Regents, the government contended that DACA amounted to a discretionary non-enforcement program that was equivalent, for the purposes of a § 701(a)(2) inquiry, to the individualized non-enforcement decisions considered in Chaney. See 591 U.S. at 17-18. In disposing of this argument, the Court noted that pursuant to the DACA program, "USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance." Id. at 18. Moreover, the Court emphasized, deferred action conferred additional benefits—eligibility for employment authorization, Social Security, and Medicare—beyond just protection against removal for two years. Id. at 18-19. For these reasons, DACA was not a "passive non-enforcement policy," but a "program for conferring affirmative immigration relief" whose rescission was not immunized from judicial review by § 701(a)(2). Id.

Like DACA, the 2022 Policy set up a formal system for determining grants of deferred action that involved specified criteria and attendant benefits apart from removal protections. See 2022 Policy. As the Eastern District of New York reasoned in A.C.R. with respect to the reviewability of the rescission of the 2022 Policy:

> The same logic [as in Regents] applies here. USCIS solicited petitions for SIJS, which it also treated as applications for deferred action. The applicants had to meet enumerated criteria . . . . USCIS then established a standardized process for reviewing those applications, which would—if successful—result in deferred action for a defined period and the ability to seek work authorization. Thus, much like DACA, [the 2022 Policy] was "more than a non-enforcement policy"—it was a "program for conferring affirmative immigration relief."

809 F.Supp.3d at 116 (citations omitted). The 2022 Policy's analogous structure to DACA thus renders implausible the government's contention that the refusal to grant Ramos Sanchez deferred action is unreviewable.

Insofar as the government bases its argument on the individualized nature of the deferred action determination here as opposed to the wholesale rescissions of deferred action programs considered in Regents and A.C.R., its position is still unconvincing. The government points out that the A.C.R. court expressly noted that its order "should not be read to suggest that USCIS remains bound by . . . any prior presumption in favor of granting deferred action to SIJS recipients." Doc. 14 at 6 (quoting A.C.R., 809 F.Supp.3d at 128 n.24 (emphasis in original)). Thus, although the government does not develop this argument,[8] one might posit that the

[8] In fact, the government explicitly does not rely on the absence of presumptive constraints in its argument for the applicability of § 701(a)(2), writing: "[p]utting aside that USCIS was not bound by its earlier Policy Manual or any presumptions therein when considering Plaintiff for deferred action, USCIS's discretionary decision to deny Plaintiff deferred action is not

decision whether to grant one person deferred action pursuant to the 2022 Policy is meaningfully different from the rescission of an entire program in that the former involves a greater degree of agency discretion than the latter.[9] But reframing the issue in this way does not allow the government to evade the holding of Regents or the logic of A.C.R. The Regents Court based its decision concerning reviewability not on its ultimate conclusion as to whether the rescission was lawful; rather, it focused on specific features of the DACA program—the enumerated criteria for eligibility and the benefits beyond removal protection that the program conferred—that made DACA an affirmative relief program. See 591 U.S. at 16-19. Those features are shared

---

subject to judicial review under the APA." Doc. 14 at 9 (internal citations omitted).

[9] Even this premise, however, is contestable. In both Regents and A.C.R., the respective court set aside the rescission of the relevant deferred action program not because the federal government lacked the authority to rescind the program under any circumstances, but because the government had not adequately considered reliance interests and reasonable alternatives in explaining the rescission. See 591 U.S. at 24-33; 809 F.Supp.3d at 121-23. Thus, the central defect determining the unlawfulness of the rescission was procedural in both cases. Here, Ramos Sanchez alleges not only that USCIS was bound by certain presumptions in favor of granting deferred action but also that USCIS's failure to explain in any way its decision to deny deferred action made its denial "arbitrary and capricious" and in violation of the APA. See Doc. 10 at 10. For this reason, her claim can be understood as relevantly similar to the claims brought in Regents and A.C.R. in that they all challenge the procedure by which the government made certain deferred action decisions, regardless of its broader authority to make the relevant decisions had it done so in a different way.

by the 2022 Policy and constitute the relevant factors in determining the reviewability of denials of deferred action, regardless of whether the denials affect one person, as here, or an entire class of individuals, as in A.C.R.

At this stage in the litigation, the appropriate focus of analysis is not on whether USCIS unlawfully failed to apply relevant presumptions in favor of granting Ramos Sanchez deferred action, but instead on whether the denial of deferred action is reviewable at all. Because the 2022 Policy created a systematic program for considering grants of deferred action and bestowed additional benefits beyond simple non-enforcement of removal provisions, Ramos Sanchez's claim before this Court is not blocked by § 701(a)(2).

## IV. CONCLUSION

For the foregoing reasons, the government's motion to dismiss is denied.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

October 14, 2026

cc: Counsel of Record